1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10   MARIA ANNE RUBIO,                )   Case No. CV 14-6230-PJW
                                      )
11              Plaintiff,            )
                                      )   MEMORANDUM OPINION AND ORDER
12      v.                            )
                                      )
13   CAROLYN W. COLVIN,               )
     Acting Commissioner of the      )
14   Social Security Administration,  )
                                      )
15              Defendant.            )
     ─────────────────────────────── )
16

17                         I.   INTRODUCTION

18       Plaintiff appeals a decision by Defendant Social Security

19   Administration ("the Agency"), denying her application for Disability

20   Insurance Benefits ("DIB").  She claims that the Administrative Law

21   Judge ("ALJ") erred when she: (1) concluded that Plaintiff's

22   fibromyalgia and chronic fatigue were not severe impairments;

23   (2) failed to consider all of Plaintiff's impairments singly and in

24   combination; and (3) discredited hers and her husband's testimony.

25   For the following reasons, the Court finds that the ALJ did not err

26   and affirms her decision.

27

28

## II.   SUMMARY OF PROCEEDINGS

In January 2011, Plaintiff applied for DIB, alleging that she had been disabled since December 2008, due to neurological problems, fibromyalgia, Parkinson's disease (maybe), diabetes, blurry vision, depression, and "high temp." (Administrative Record ("AR") 127, 162.) Her application was denied initially and on reconsideration and she requested and was granted a hearing before an ALJ. (AR 68, 72, 76-81, 85-89, 91-93.) In August 2012, she appeared with counsel and testified at the hearing. (AR 37-67.) Thereafter, the ALJ issued a decision denying benefits. (AR 18-30.) Plaintiff appealed to the Appeals Council, which denied review almost two years later. (AR 1-11, 15-16.) Plaintiff then filed the instant action.

## III.   ANALYSIS

A.   The Credibility Determination

Plaintiff testified that she had been suffering from constant pain in her shoulders, neck, arms, and side since 2007. (AR 46, 57.) She also testified that she experienced severe fatigue--to such an extent that she would sleep until four or five in the afternoon--from 2009 through March 2012, when she "woke up" after doing holistic meditation. (AR 51-52.) Plaintiff explained that she was currently sleeping until 11:00 a.m. (AR 52.) According to Plaintiff, she needed to rest for 45 minutes after doing any sort of activity, like making lunch. (AR 53, 55.) She claimed that she needed to empty her bladder every 45 minutes and that she would "leak" a little when she felt the urgency to urinate. (AR 55-56.) She also testified that her pain prevented her from walking further than the corner of her block and standing for longer than a couple of minutes and that she used a walker to get around. (AR 58-59.)

2

The ALJ found that Plaintiff's obesity, history of right shoulder surgery, and asthma were severe impairments that could reasonably be expected to cause her alleged symptoms but concluded that she was not entirely credible. (AR 23, 28.) Plaintiff claims that the reasons the ALJ gave in support of the credibility finding were inadequate. For the following reasons, the Court disagrees.

ALJs are tasked with judging a claimant's credibility. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). In doing so, they can rely on ordinary credibility techniques. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). Where there is no evidence of malingering, however, they can only reject a claimant's testimony for specific, clear, and convincing reasons that are supported by substantial evidence in the record. *Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014).

The ALJ discounted Plaintiff's testimony that she was practically unable to stand and walk because it was contradicted by the medical evidence. (AR 28.) The ALJ pointed out that, in examinations in April 2009, October 2009, April 2010, and April 2011, the doctors reported that Plaintiff's gait was steady and intact and that she could walk without an assistive device. (AR 28, 210, 217, 942, 1060.) In fact, in April 2010, consultative examiner Michael Wallack described her as "extremely agile" and noted that she moved about in a "brisk" manner.[1] (AR 942.) The ALJ also pointed to a July 2011 note in which Plaintiff's doctor declined to put her on disability because,

---

[1] At the April 2011 examination, Dr. Wallack reported that Plaintiff moved slowly, with her legs far apart, but opined that her gait appeared to be forced. (AR 1058.) In both April 2010 and April 2011, however, he found that she could stand or walk for at least six hours. (AR 945, 1061.)

among other things, there were conflicting diagnoses for her
rheumatological ailments.  (AR 248.)

The ALJ was entitled to consider the medical evidence in
evaluating Plaintiff's testimony, *see*, *e.g.*, *Osenbrock v. Apfel*, 240
F.3d 1157, 1165-66 (9th Cir. 2001) (upholding ALJ's credibility
determination based in part on the fact that the medical evaluations
revealed little evidence of the disabling abnormality alleged by
claimant), and, as she noted, it contradicted Plaintiff's testimony.

The ALJ also questioned Plaintiff's testimony because it was
inconsistent with other statements she had made.  (AR 28.)  This, too,
is a legitimate reason for disputing a claimant's testimony and is
partially supported by the evidence.  *Smolen*, 80 F.3d at 1284.
Plaintiff claimed in her disability application that she stopped
working because of her conditions.  (AR 162.)  But she told an
examining psychiatrist that she was laid off because of a conflict
with her boss.  (AR 162, 764.)  She later told the same psychiatrist
that she stopped working because she sent an inappropriate email to a
colleague.  (AR 1052.)  Plaintiff testified at the administrative
hearing that she was fired for missing too much work to attend
doctors' appointments.  (AR 41-42.)  The ALJ was entitled to consider
these inconsistencies when evaluating Plaintiff's testimony.[2]

_____

[2]  The ALJ noted other inconsistent statements.  (AR 28.)  For
example, in March 2010, Plaintiff reported that she was able to drive.
(AR 763.)  In June 2011, she said that she could not drive "at all."
(AR 177.)  Given the passage of time, however, things could have
changed and, therefore, these statements may not actually evidence
untruthfulness.  Similarly, Plaintiff's general testimony that between
2009 and 2012 she slept all day (AR 42, 51-52), was not necessarily
inconsistent with statements she made to her doctors that she
sometimes exercised or cooked.  (AR 525, 941, 1293.)  In August 2008,
for example, Plaintiff told Dr. Wonil Lee that she felt tired all the

1    The ALJ noted that Plaintiff reported taking a trip to Israel,
2    Egypt, and Jordan in May and/or June 2011, which the ALJ found to be
3    inconsistent with Plaintiff's claimed disabilities.  (AR 28-29, 1271,
4    1272.)  The Court agrees.  It was reasonable for the ALJ to conclude
5    that if Plaintiff was capable of traveling from California to the
6    Middle East for vacation she was not as limited as she claimed to be.
7    *See*, *e.g.*, *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008)
8    (holding ALJ properly discounted claimant's testimony of pain and
9    limitation partly on basis of travel abroad).

10    The ALJ found that Plaintiff's daily activities, which included
11    making lunch and dinner occasionally, taking her daughter to martial
12    arts twice a week, and going to the doctor regularly, showed that she
13    was not as limited as she claimed to be.  (AR 28.)  The Court finds
14    that the limited nature of these activities combined with the fact
15    that Plaintiff claimed that she needed to rest for 45 minutes after
16    completing them does not undermine her credibility.  *See Orn v.*
17    *Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (rejecting ALJ's reliance on
18    claimant's daily activities where they did not contradict his
19    testimony or show that he could transfer these abilities to a work
20    setting).

21    Finally, the ALJ found that Plaintiff received only conservative
22    treatment for her allegedly disabling conditions.  (AR 29.)  Though
23    this is a legitimate reason for questioning a claimant's testimony,
24    *see Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (noting

25

26    time and had difficulty getting up in the morning, but also reported
27    keeping physically active doing yoga and exercises.  (AR 779.)  These
      statements did not necessarily undermine Plaintiff's subsequent
28    testimony.

conservative treatment, including use of only over-the-counter medication to control pain, supported discounting claimant's testimony regarding pain), it is not supported by substantial evidence.  The ALJ focused on records from January and February 2011 to reach this conclusion.   These records showed that neurologist Ravin Jain provided only medication--Cymbalta, Lyrica, and Aspirin--for Plaintiff's complaints of fatigue and weakness.  (AR 29, 1086-1106.)  Yet, as the ALJ noted, Plaintiff was complaining about a number of other ailments, including left-sided radiculopathy, bladder suspension, leiomyomata (uterine fibroids), an ankle sprain, a tear in her shoulder tendon, and asthma, over an extended period of time.  (AR 23, 26.)  Plaintiff underwent right shoulder repair in February 2010, bladder surgery in May 2010, and uterine surgery in December 2010, as well as a hysterectomy and removal of the Fallopian tube in September 2011.  (AR 26, 967-68, 977-79, 1136-37, 1318.)  She also testified that she received epidural injections in her shoulder and back.  (AR 57.)  The Court does not consider these treatments as conservative.  As for Plaintiff's treatment for fibromyalgia and chronic fatigue by Dr. Jain, there is no evidence in the record that suggests that Plaintiff's treatment should have been more aggressive.  For these reasons, the Court rejects the ALJ's finding that Plaintiff's treatment was conservative and that that conservative treatment indicated that she was not as impaired as she claimed.[3]

---

[3]  The ALJ may have believed that Plaintiff's treatment was conservative based on Dr. Jain's note in January 2011 that "conservative therapy" had been recommended for Plaintiff's chiari malformation (AR 1088), a condition in which brain tissue extends into the spinal canal, potentially affecting balance and coordination.  *See* http://www.mayoclinic.org/diseases-conditions/chiari-malformation/basics/symptoms/con-20031115.

In the end, the Court concludes that, of the ALJ's five reasons for rejecting Plaintiff's testimony, three are clear and convincing and two are not. On balance, the Court finds that the three reasons that are supported by the record are enough to uphold the ALJ's finding. *See Carmickle v. Comm'r, Soc. Sec.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) (holding error is harmless if substantial evidence remains to support the ALJ's credibility conclusion). For that reason, it is affirmed.

Plaintiff also contends that the ALJ erred in rejecting her husband's testimony. He testified that his wife's condition had greatly deteriorated since 2008. (AR 62-65.) There is no merit to this claim.

ALJs are required to assess the credibility of the lay witnesses and may reject lay witness testimony for reasons that are germane to the witness. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). The ALJ rejected the husband's testimony in part because his allegations were inconsistent with the medical evidence. (AR 29.) This is a germane reason for rejecting lay testimony, *see Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005), and it is supported by substantial evidence in the record. Plaintiff's husband testified, essentially, that he knew that Plaintiff was in pain because she said so and because it took her a long time to walk from place to place. That testimony was contradicted, however, by the consultative examiner's April 2010 report that Plaintiff could move unassisted in a brisk fashion and evidently without pain. (AR 942.) As such, the ALJ's rejection of the husband's testimony will be affirmed.

B.    The Residual Functional Capacity Determination

The ALJ concluded that Plaintiff had the residual functional capacity to perform a full range of medium work but had to avoid concentrated exposure to dust, fumes, and chemicals.  (AR 25.) Plaintiff contends that the ALJ erred by failing to consider all of her impairments, both severe and non-severe, including her pain, restless leg syndrome, incontinence, uterine complaints, chronic fatigue, and hearing loss.  (Joint Stip. at 9-12.)  The Court finds that the ALJ's failure to include these ailments in the residual functional capacity finding was not error.

In formulating the residual functional capacity, the ALJ need not perform a function-by-function analysis; rather, she need only include those limitations that are supported by objective evidence in the record.  *Bayliss*, 427 F.3d at 1217.  The mere existence of an impairment does not by itself constitute evidence of a functional limitation.  *See, e.g., Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228-29 (9th Cir. 2009) (rejecting claimant's argument that a severe impairment "must correspond to limitations on a claimant's ability to perform basic work activities.").

Plaintiff contends that the ALJ erred when she found at step two that Plaintiff's fibromyalgia and chronic fatigue were not severe impairments because no doctor had ever evaluated her for them or confirmed that she suffered from them.  The Agency appears to concede that the ALJ erred in not including these conditions at step two. (Joint Stip. at 7.)  The issue that remains is whether the error was harmless.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). The Court finds that it was.  Plaintiff alleges that her fibromyalgia leads to decreased sensation in her hands and contributes to pain and

weakness in standing and walking.  (Joint Stip. at 2, 7.)  The ALJ
considered whether Plaintiff could stand, walk, and grip and, relying
on the opinion of Dr. Wallack, concluded that she could.  (AR 25-29,
942-46, 1058-62.)  Dr. Wallack's opinion constituted substantial
evidence to support the ALJ's finding.  *See Orn*, 495 F.3d at 632
(holding independent clinical findings of examining doctor constitute
substantial evidence).  The ALJ was justified then in not including
those claimed ailments in the residual functional capacity
determination.  *See Bayliss*, 427 F.3d at 1217.  Likewise, even
assuming that the ALJ erred in finding that Plaintiff's chronic
fatigue was not a severe impairment, there was no objective evidence
in the record to support Plaintiff's allegation that she needed to
take additional breaks or take long naps throughout the day.  As such,
the ALJ was entitled to disregard it.  *Id*.[4]

The ALJ considered Plaintiff's osteoarthritis and degenerative
spine disease, which, Plaintiff alleged, caused her constant pain in
her back and side and limited her ability to stand and walk.  (Joint
Stip. at 9; AR 57-59.)  The ALJ noted that a cervical spine MRI and
lumbar spine X-rays in 2008 showed only slight abnormalities (AR 207,
964), but that EMG and NCV studies in 2009 and 2010 showed moderate
radiculopathy in the cervical and lumbar spine.  (AR 26-27, 262, 292.)
Nevertheless, an April 2010 MRI of Plaintiff's lumbar spine was
unremarkable and February 2011 EMG/NCV studies revealed no evidence of

---

[4]  In April 2009, Dr. Fawaz Al Faisal treated Plaintiff for her
sleep disorder.  His neurological examination was unremarkable,
however, and his assessment of "excessive daytime somnolence, rule out
narcolepsy" appears to have been based entirely on Plaintiff's
allegations.  (AR 610-12.)  A May 2009 polysomnogram revealed
decreased sleep efficiency but no evidence of sleep apnea or
narcolepsy.  (AR 396.)

lumbar or cervical radiculopathy, myopathy, or neuropathy.  (AR 27, 319-20, 423, 426.)  As a result, the ALJ did not err in relying on Dr. Wallack's opinion that Plaintiff would be able to stand or walk for up to six hours a day.

The ALJ did not expressly consider whether Plaintiff's restless leg syndrome, uterine issues, or hearing impairment would impose any functional limitations.  As a general matter, though the ALJ was required to consider all of the evidence, she was not required to address each piece of it in her decision.  *See Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (holding ALJ is not required to discuss every piece of evidence so long as the decision is supported by substantial evidence).  In any case, the Court finds that, even assuming that the ALJ should have discussed these claimed impairments, any error was harmless.  Plaintiff did not allege that she suffered from any particular restrictions or limitations as a result of restless leg syndrome or her uterine surgery.  Dr. Arash Horizon opined that restless leg syndrome exacerbated Plaintiff's fibromyalgia (AR 1285), but he did not explain how that translated into functional restrictions.  Furthermore, following Plaintiff's September 2011 hysterectomy, her gynecologist reported in February 2012 that she had made a full recovery.  (AR 1318.)  Although Plaintiff complained at the August 2012 hearing that she continued to suffer from bleeding, she testified that she treated it with injections every three months and did not claim that it limited her ability to work.  (AR 44, 46.)

As for Plaintiff's hearing loss, the record contains a September 2011 letter from Dr. Warren Line, who found that Plaintiff had moderate hearing loss in both ears, which was not disabling.  (AR

1312.)   The transcript from the administrative hearing does not
reference Plaintiff having any problem hearing, nor did she raise the
issue at any time.   Thus, the Court cannot conclude that the ALJ erred
in failing to include hearing issues in the residual functional
capacity finding.

Finally, Plaintiff argues that the ALJ failed to consider
limitations imposed by her incontinence.   (Joint Stip. at 10-11.)
Here, again, the Court sides with the Agency.   Plaintiff, who was 48
at the time of the administrative hearing, has suffered from
incontinence since she was 17 years old.   (AR 953-54.)   Despite this
fact, she held down jobs throughout her lifetime, including jobs in
human resources from 1992-2008.   (AR 136-48, 186-87.)   As she
concedes, her incontinence played no role in her being fired from her
last job as the human resources manager in 2008.   (AR 41-42.)

After applying for benefits, Plaintiff was interviewed by Agency
staff and asked what conditions limited her ability to work.   (AR
162.)   She did not list incontinence.   (AR 162.)   After the Agency
initially denied her application, she moved for reconsideration,
explaining why she disagreed with the Agency's decision denying her
application.   (AR 91.)   Again, she did not raise incontinence.   (AR
91.)   Plaintiff appeared with counsel at the administrative hearing
and testified that she senses an urgency to urinate every 45 minutes
to an hour and experiences a "leak or two" in connection with this
urgency.   (AR 55-56.)   Thereafter, the vocational expert testified
that a hypothetical person with the same education and work history as
Plaintiff could perform her past work in human resources.   (AR 66.)
When given an opportunity to question the vocational expert about

1  Plaintiff's ability to perform these jobs, counsel elected not to ask
2  about Plaintiff's incontinence.  (AR 66-67.)

3      Plaintiff now argues that the ALJ erred when she failed to
4  consider how Plaintiff's incontinence impacted her residual functional
5  capacity.  The Court does not find this argument persuasive.  The
6  record suggests that Plaintiff's incontinence did not interfere with
7  her work ability to work for 31 years nor did Plaintiff claim that it
8  did.  Thus, the ALJ did not err in failing to include it in the
9  residual functional capacity assessment.  This is true even in light
10 of the fact that Plaintiff testified that her condition had worsened
11 in recent years.  (AR 55.)  First, the ALJ questioned Plaintiff's
12 testimony, finding it to be less than credible, and there was minimal
13 objective evidence to support her claim of worsening problems with
14 incontinence.  Second, even assuming that her testimony was true, she
15 has not convinced this Court that her need to rush to the bathroom
16 once every 45-60 minutes to relieve herself would interfere with her
17 ability to be a human resources manager and nothing she has presented
18 here suggests that it would.

19                    IV.   CONCLUSION

20     For these reasons, the Agency's decision is affirmed and the case
21 is dismissed with prejudice.

22     IT IS SO ORDERED.

23     DATE: March 16, 2016

24

25                                   _____
                                     PATRICK J. WALSH
26                                   UNITED STATES MAGISTRATE JUDGE

27

28 S:\PJW\Cases-Social Security\RUBIO, M 6230\Memo Opinion and Order.wpd

12